## GONZALEZ v. DAVILA.
### No. 2415.

Court of Civil Appeals of Texas. El Paso.
April 3, 1930.

Rehearing Denied April 17, 1930.

Fagan Dixon and Hicks, Hicks, Dickson & Lange, all of San Antonio, for appellant.

Edward Dwyer and R. B. Russell, both of San Antonio, John A. Pope and Bismark Pope, both of Laredo, and John A. Pope, Jr., of Rio Grande City, for appellee.

HIGGINS, J.

This is an action to recover damages, actual and exemplary, alleged to have been sustained by appellee, Davila, arising out of breach of lease contract executed by appellant, Gonzalez, as lessor, and Davila as lessee.

The contract was in the Spanish language, dated February 18, 1925, and was signed by the parties named. A translation thereof appears in the record. By its terms, Gonzalez leased to Davila the Laredo Ice Factory until March 1, 1926. The lessee agreed to immediately start making the repairs necessary for the functioning of the plant, and to deposit the sum of $1,000 with a bank named, and to keep said amount there during the term of the lease.

Prior to the execution of this contract, Gonzalez had given an option to purchase the property to certain parties, which option would expire March 1. The controlling question in the case is whether the lease was made subject to this option contract, as evidenced by a letter which reads:

"Feb. 18, 1925.

"Mr. Julio Davila, City.

"Dear Sir and Friend: This will serve to duly determine two points relative to the contract lease of this Factory, which both of us have just subscribed, on which we had already verbally dealed.

"First, That although in the third clause it is specified that the time of the lease will begin to count from the first day of next March, but this will be subject to the decision that I would have from the option of sale that I have given to a third person, which time expires on the said first day; so if said decision be negative, then you will enter in possession of the property on my immediate advice which I will give you on the same mentioned date, that is, it might be on the same mentioned date or on the four following days, or on the 5th day of March as the latest day.

"In case that the transaction should be realized as I have above stated, on which event I would also advise you in due time, both of us will be relieved of all obligations, and for such reason, the signed contract will be null and void and without any further effect.

"Second, Taking in consideration the repairs that you are going to make on the serpentine (Serpentina) boilers, trucks, etc., and as will take the whole month of March, I agree in not charging to you the amount of rent belonging to said month.

"I will highly appreciate if you would give me your written consent for the above,

"I remain,

"Yours very truly,

"[Signed] P. Gonzalez."

The lease and letter were written by Gonzalez and delivered to his bookkeeper, Armado de Emparan, for delivery to Davila after the latter had signed the lease instrument and given a letter recognizing the letter above quoted to be supplementary to and part of the terms of the lease. De Emparan testified:

"Upon Mr. Davila's arrival at the Bank, I delivered both documents to him; he read both of them and signed the memorandum of lease there; then he told me that he was in accord with everything that was talked about and done; I then asked him to have a seat in a chair and use the typewriter to write an answer to the letter of General Gonzalez. When I say "letter" I refer to the letter which was attached to the lease contract; but Mr. Davila said it was a little late and that he did not want to keep Domingo there—so I asked him to deliver me the answer to the

letter the following morning and he agreed to send me the answer to this letter the following morning. Yes, the letter was attached to the lease when I handed the papers to Davila. He read both documents, signed one of them and handed it to me; then he doubled them up together and put them in his pocket. He delivered me a check at the time which I, in turn, delivered to General Gonzalez. The check was deposited and the money remained on deposit at the Mexican-American Bank. I did not receive a reply to this letter from Mr. Davila the next morning as he had promised and I, therefore, went to the garage on the next day and he then, as a pretext, told me that he didn't have any writing paper with his letterhead and told me he would send me the letter to the office; I went to see him again, later—two or three times—but couldn't find him; I also called him by telephone, but never could get him."

Davila's version of the matter is as follows:

"When the contract of February 18, 1925, was signed by General Gonzalez and myself, I was in the banking office of the Mexican-American Commercial and Banking Company at Laredo, Texas. There were present at that time Domingo Gonzalez and Mr. de Emparan. General Gonzalez was not present. The contract was already signed by Mr. Gonzalez, and de Emparan and Domingo Gonzalez informed me that General Gonzalez had left Laredo. There was no letter attached to the contract signed by General Gonzalez. All this occurred in the evening before six o'clock and Mr. de Emparan, Domingo Gonzalez and I were present in the Bank when the contract was signed. At the time the contract was signed there was no letter handed to me. After I signed that contract and delivered the check for $500.00 and got the receipt, I expected a letter stating some particular agreement; that agreement was that Mr. Gonzalez was going to protect some accounts, some molds for the ice—Mr. Gonzalez was not going to obligate me to deposit $1,000.00 at once; and that they were not going to collect the rent from that month because I was going to use that month for repairs; I was expecting that letter, but instead of that letter they handed me the original of this letter dated February 18th. They handed me this letter about three quarters of an hour more or less after I signed that contract and gave them the check for $500.00. We spent more than three quarters of an hour there discussing this thing, and after I signed the contract. I signed the contract and wanted the inventory showing valuations—I refused to sign the contract before that time—we were also discussing that at the time. They handed me this letter about forty-five minutes after I signed the contract and after they got my check. We had a hot argument about that. I asked them to give me my check

back. I told Mr. Emparan that that was not the letter I was expecting; then they menaced me; I was already in their hands; that I had already signed the contract and made the deposit. I told him if I don't get the letter in the form we had stipulated, then I would want my money back. We had an argument about that. * * *

"Mr. Emparan and I had quite a heated argument at that time. I told him that this letter was not what we had talked about before we had signed the contract; that I had contracted the obligation to start repairs at once and that the contract was not subject to anything like that; that I also objected because the letter did not say that Mr. Gonzalez owed the obligation to provide the molds missing from the factory and that he did not expect a thousand dollars to be deposited as the contract called for, neither to collect the rent for the month for which I was going to spend in repairs; we had that arrangement. Mr. Emparan said that Mr. Gonzalez was out and that that was the only letter of Mr. Gonzalez that he had, and that if I will not sign it that he could not do any more; but three days afterwards he went to the factory and delivered the factory to me. He never changed the letter and never accepted the agreement from me. You can read the agreement of that letter yourself."

The testimony quoted shows the theories of the respective parties as to whether the letter constituted a part of the contract. Upon special issues, the jury found in favor of Davila's theory.

It was also found that prior to March 5th the defendant or his agent, De Emparan, placed Davila in possession of the factory with intention of delivering it to Davila for operation as lessee under the terms of the lease. The evidence shows such possession was delivered February 25th, and Davila at once commenced to make the necessary repairs and incurred considerable expense in so doing.

On March 6th Davila received from Gonzalez a telegram which reads:

"San Antonia, Texas, 12:25 P. March 5, 1925.

"Julio Davila, 1301 Hidalgo st., Laredo, Texas.

"Very sorry to state that contract of rental is hereby canceled as I have sold Laredo Ice Factory Stop I have made every effort to retain contract but purchasers want to operate themselves Stop From this moment you are released from all obligations Will pay in due time $100.00 repairing trucks.
                                      "P. Gonzalez."

Davila declined to surrender the factory, and on March 10th Gonzalez obtained from the district judge a temporary restraining order, the effect of which was to oust Davila from possession. March 10th Davila moved to dissolve, and upon such motion the restraining order was dissolved March 19th, to which action Gonzalez excepted and gave notice of appeal. Davila then notified Gonzalez he would surrender possession and not operate under the lease, and thereafter, on March 26th, Gonzalez withdrew his notice of appeal and dismissed his suit. On March 31, 1925, Davila filed this suit, having elected to treat the contract as breached by Gonzalez.

By its findings, the jury awarded damages in the sum of $2,500 for lost profits which Davila would have made but for the breach of the contract, also awarded exemplary damages in the sum of $3,500, and judgment was rendered accordingly.

The propositions submitted will be considered in the order most convenient rather than in the order presented in this brief.

As before stated, Davila, on March 10th, moved to dissolve the temporary restraining order which had been entered against him. In this motion he set up the lease contract and that appellant on February 25th had abandoned any claim that the letter of February 18th constituted a part of the contract and had placed him in possession of the factory.

■■ It is now contended that by these allegations he had elected to enforce the lease contract and under the doctrine of election of remedies was precluded from thereafter electing to treat the contract as breached and suing for damages. Davila was simply defending and asserting his rights under the contract, and the doctrine of election of remedies has no application whatever. 32 C. J. p. 358, § 594, and page 429, § 735. The injunction was not dissolved until March 19th, and the injunction suit not finally disposed of until the voluntary dismissal on March 26th. The injunction interrupted and so delayed Davila in making the necessary repairs upon the plant that he could not get same in proper condition to operate same profitably during the ensuing spring and summer, which was the only time it could be operated at a profit. Under these circumstances Davila had the perfect right, after the dismissal of the injunction suit, to treat the contract as breached and sue for the damages sustained.

There is no merit in the proposition that the evidence fails to show De Emparan had authority to deliver the contract to Davila. On the contrary, the testimony of both De Emparan and Gonzalez shows he did have such authority. It is true, according to both De Emparan and Gonzalez, delivery of the formal contract was to be accompanied by the letter and according to their testimony the letter was contemporaneously delivered and assented to by Davila. This Davila denies, but that simply raises an issue of fact as to the terms of the whole contract, and

does not impeach the authority of De Emparan to act for Davila in closing the contract by delivery of the written evidence thereof. Appellant confuses the issue as to the terms of the contract with the agent's authority to act for Gonzalez in the delivery of the instrument evidencing such contract.

■ Those propositions are overruled which assert prospective profits to be derived from the operation of the plant cannot be recovered because too uncertain, speculative, and remote. Appellant in this connection relies upon cases so holding where there has been an interruption of an entirely new enterprise or business. Walter Box Co. v. Blackburn (Tex. Civ. App.) 157 S. W. 220; Texas P. &. L. Co. v. Roberts (Tex. Civ. App.) 187 S. W. 225; McArthur v. Day (Tex. Civ. App.) 19 S.W.(2d) 134.

It is true the ice factory had been idle during the winter of 1924–25, but this was habitual during the winter because of the seasonal nature of the product. It is also true Davila had not previously operated an ice factory, but it does not necessarily follow that he could not have successfully operated the plant.

The factory had a daily capacity of twenty tons. It made the best ice in Laredo, and Gonzalez testified there was a ready demand for it, and in previous years they would sell daily all they made.

The evidence shows the post office was a regular customer and used considerable ice. It was also shown that Davila had contracted six tons daily to one ice retailer and four tons to another. He also expected to easily dispose of the balance of the output to the general trade, and, as stated, Gonzalez had testified the ice was in demand and readily sold. Upon this evidence the authorities relied upon by appellant have no present application.

The objection to the admissibility of the evidence concerning the Santos six-ton contract and the Martinez four-ton contract, presented by the fifteenth point, was properly overruled. The objection affects the weight to be given the evidence rather than its competency.

The twelfth point complains of the overruling of a special exception to the petition. The exception was properly overruled.

The jury found defendant procured the temporary restraining order against plaintiff with malicious intent towards plaintiff; also that, in causing the gates to the premises to be locked, defendant did so with malicious intent towards plaintiff. In connection with these issues, the court charged that "by the use of the term: 'Malicious intent' is meant with intent to injure and having no reasonable grounds to believe the act to be justified in law."

■ Appellant does not question the correctness of the court's definition of the term "malicious intent," but asserts the charge should have gone further and instructed the jury "in effect that the mere violation of a right and the inflicting of actual damages are not sufficient to warrant the recovery of punitive damages, but the wrongful acts, in order to subject the defendant to punitive damages, must constitute a tort, accompanied by fraud, malice, gross negligence or oppression, and that the mere breach of a contract or the filing of an injunction suit is insufficient." This position is untenable, for the reason that a charge of the nature indicated would be upon the weight of the evidence and also offend against the rule, in cases submitted upon special issues, which forbids the giving of charges general in their nature and instructing the jury as to the law arising on the facts. Connellee v. Nees (Tex. Com. App.) 266 S. W. 502; Freeman v. Ry. Co. (Tex. Com. App.) 287 S. W. 902.

Nor is there merit in the contention that the award of exemplary damages is unsupported by the pleading and evidence. This case presents more than a mere breach of contract, for which exemplary damages will not be awarded.

■ There is doubt in our mind as to correctness of the finding that Gonzalez acted maliciously in obtaining the temporary restraining order and locking the gates to the premises, but we are not prepared to set aside the finding of the jury that he did so with malice. This being the case, the defendant not only breached the contract of lease, but the breach was accompanied by tort, maliciously perpetrated, and in such cases exemplary damages are recoverable. This is a well-settled rule. 17 C. J. 976, § 272, and cases there cited.

In plaintiff's petition it was alleged: "And asserted to this plaintiff that the defendant was a man of powerful influence financially and that by reason of the strong financial position of the defendant it would avail plaintiff nothing to attempt in any way or manner to assert any claim under the lease herein described." To this defendant excepted "because the same is irrelevant and impertinent to any issue in the case and is prejudicial to defendant and inflammatory and misleading and is made for the purpose of prejudicing the jury against the defendant." The exception was overruled.

By bill of exception it is shown: "In the course of his address to the jury, Mr. Dwyer, plaintiff's attorney, made the statement suggesting that plaintiff was a poor man because he could not get up the other $500.00, and, further, stating that 'this fellow (defendant) takes in lots of money, and $20,000.00 is no money to him'; further, 'that to this man

(Davila) running a factory, $20,000.00 was a lot of money'; and said attorney then continued on, comparing that with General Gonzalez' (defendant) financial ability."

Immediately upon the making of the said statements on the part of plaintiff's attorney, defendant objected to the said remarks of counsel, because the same were highly inflammatory and prejudicial to this defendant; further, that the said remarks of counsel were improper, in that the relative wealth of the plaintiff or of the defendant was not a subject-matter to be discussed before the jury in this case; further, that there was no testimony in the record on which the plaintiff could predicate any reason for injecting prejudicial matters of this character into this case and bringing such matters before the jury.

The bill further discloses the court instructed the jury to disregard the said remarks of plaintiff's counsel. Argument of the nature indicated has been repeatedly condemned and uniformly held to be reversible unless the record discloses it had no harmful effect. The harm done by such argument cannot be corrected by instructions to the jury to disregard it. In the present case we cannot treat the improper argument as harmless.

The award of exemplary damages is of doubtful propriety under the evidence and a rather large award made.

Again, to us the evidence seems to support the view that the letter constituted a part of the lease contract, but the jury found that issue in favor of plaintiff, and this court would not be warranted in setting aside such finding. We merely refer to this as showing the close issue made by the evidence upon the basic controlling question in the case.

Again, the award of damages for lost profits is heavy in the state of the evidence.

We cannot say the objectionable argument was without influence upon the jury in deciding the controlling issues upon which depends the liability for both actual and exemplary damages; nor can we say it did not contribute to the amounts awarded. For this improper argument the case will be reversed. Dillingham v. Scales, 78 Tex. 205, 14 S. W. 566; Campbell v. Prieto (Tex. Civ. App.) 143 S. W. 668; Trueheart v. Parker (Tex. Civ. App.) 257 S. W. 640, approved by the Supreme Court in Davis v. Hill (Tex. Com. App.) 298 S. W. 526; Floyd v. Fidelity Union Casualty Co. (Tex. Civ. App.) 13 S.W. (2d) 909.

The overruling of the exception above noted is probably not reversible, but the allegation should have been stricken, and the harmful effect of the improper argument by appellee's counsel was perhaps accentuated by the improper allegation concerning defendant's financial power and position.

The ruling concerning the testimony of the witness Anacieto Martinez need not be reviewed. The question presented should not arise upon retrial.

For the reason stated, the cause is reversed and remanded.